# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cr-00729-RBW |
| | ) | |
| BRENT JOHN HOLDRIDGE | ) | |

## DEFENDANT'S MOTION FOR TRANSFER OF VENUE OR, IN THE ALTERNATIVE, TO ALLOW EXPANDED EXAMINATION OF PROSPECTIVE JURORS BEFORE AND DURING VOIR DIRE

Defendant Brent John Holdridge, through counsel, moves the Court to transfer the proceedings to another district because the prejudice against his defense is so great in this District that an impartial jury cannot be empaneled. This case involves the highly publicized events at the United States Capitol Building that occurred on January 6, 2021. A transfer of venue is essential to secure Mr. Holdridge's constitutional right to a fair trial, because "so great a prejudice against the defendant exists in [this District] that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).

If the Court denies Mr. Holdridge's motion, he respectfully, alternatively requests that the Court permit an expanded examination of prospective jurors. Specifically, he requests:

(1) that the defense be allowed to prepare a questionnaire by July 15, 2022 that, after review and approval by the Court, would be distributed to summoned prospective jurors to return before trial;

(2) that the parties be present for any pre-screening questioning of prospective jurors that the Court conducts before the beginning of formal voir dire; and

(3) that the parties be permitted to question jurors individually during voir dire.

## I.      Introduction

This case involves events that much of the public has strong opinions about, including opinions about the intentions of persons who entered the Capitol Building on the charged date. And as this motion describes below, those opinions are especially strong, and especially prejudicial to Mr. Holdridge, in this District. Those preexisting views are so widespread in the District's jury pool that they pose a grave threat to Mr. Holdridge's right to a fair trial.

Although evidence produced by the government shows that Mr. Holdridge walked slowly around the inside of Capitol Building on January 6, 2021, took photographs, and engaged in a visibly courteous exchange with a guard, the Information alleges that he, among other things, "willfully and knowingly engaged in disorderly and disruptive conduct in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress or either House of Congress." *See* Docket 25. The concern here is that a jury will impermissibly fill in the gaps between Mr. Holdridge's conduct and the required mental states alleged in the superseding Information with their own pre-existing experiences with and media coverage of the events of January 6, 2021.

Mr. Holdridge has the right to be tried by a jury that will judge him on the evidence alone, without being tempted to tar him with the same brush as others who were present at the Capitol Grounds or who shared some of his political views. The case should be transferred to a different district because the potential for that temptation among jurors drawn from this District is simply too great. If the Court

does not transfer the case, then expanded examination of prospective jurors will be essential to minimize the extent to which a trial would be infected by prejudice against the defendant.

## II. Transfer to another district is necessary if Mr. Holdridge is to receive a fair trial.

The Fifth Amendment's Due Process Clause and the Sixth Amendment's Jury Trial Clause guarantee Mr. Holdridge the right to a fair trial by an impartial jury. *Skilling v. United States*, 561 U.S. 358, 378–79 (2010). Ordinarily, the trial should be held with "an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. But "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process'"—then "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request," *Skilling*, 561 U.S. at 378 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). In fact, where "so great a prejudice against the defendant exists in the [venue] district that the defendant cannot obtain a fair and impartial trial there," a court "*must transfer* the proceeding . . . to another district," Fed. R. Crim. P. 21(a) (emphasis added).

This is not an ordinary case. It involves events, and interpretations of events, which has been subject to a barrage of negative media coverage and public discourse. And it has not gotten better over time. The House Select Committee started holding public hearings only a few days ago, which has been widely broadcast during prime

time and has included graphic videos and dramatic testimony.[1] As the Washington Post summarized, the first day of the hearing "reached a jarring climax in an 11-minute video montage of violent marauders attacking the temple of that democracy, sending police officers flailing and lawmakers fleeing as the disembodied voice of a president played over it."[2] Although the impact of such press coverage is likely felt everywhere, it will be uniquely felt in Washington D.C. given its size, characteristics, and the personal impact that the events had on its population.

There are two types of prejudice – actual and presumed. Actual prejudice is confirmed through the voir dire process. *Skilling*, 561 U.S. at 385–95. In contrast, presumed prejudice cannot be negated by jurors' voir dire responses. *See id.* at 379-80; *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963) (where the Court found presumptive prejudice, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from" a different community of people).

The Supreme Court has found presumed prejudice in the extreme cases where "[the] trial atmosphere [has been] utterly corrupted by press coverage." *Skilling*, 561 U.S. at 380-81 (quoting *Murphy v. Florida*, 421 U.S. 794, 798-799 (1975)). In deciding whether a presumption is warranted, the Supreme Court has identified three factors

---

[1] Mike DeBonis, *Jan. 6 committee uses video, testimony to tell tale of the insurrection* (Jun. 10, 2022), https://www.washingtonpost.com/national-security/2022/06/09/jan-6-committee-uses-video-testimony-tell-tale-insurrection/.
[2] *Id.*

for the lower courts to consider[3]: (1) the size and composition of the community the jury is drawn from, (2) the pervasiveness and tenor of media coverage, and (3) the length of time between the relevant events and trial. *Id.* at 382–83. Each of those considerations weighs strongly in favor of presumed prejudice in this case.

### A.   The size of D.C. jury pool is unusually small and has been uniquely affected by the events of January 6.

The size and characteristics of this District weigh in favor of presumed prejudice. The District of Columbia is one of the smallest and geographically compact federal judicial district. The Census Bureau estimates that D.C.'s total population was 670,050 on July 1, 2021, with approximately 18.2 percent being under the age of 18, leaving a voting-age population under 550,000.[4] Furthermore, D.C.'s entire population resides in a space of just 68.34 square miles.[5] With the Capitol Building near the geographic center, all of the District's residents live within 7½ miles of the site.

Moreover, although the events of January 6 have been huge news nationally, they affected D.C. residents much more directly. In the aftermath of the events, D.C. was transformed: "Businesses were forced to shutter. Streets were closed. Neighborhood parks where dogs once ran and children played were instead patrolled

---

[3] The Court also identified a fourth factor that *reviewing* courts may consider after-the-fact in deciding whether prejudice should have been presumed: whether the jury in the contested venue convicted on fewer than all counts. *Skilling*, 561 U.S. at 383–84. This factor is inapplicable for a trial court's advance determination of presumed prejudice.

[4] *U.S. Census Bureau Quickfacts: District of Columbia*, https://www.census.gov/quickfacts/DC (last visited June 8, 2022).

[5] U.S. Census Bureau, *District of Columbia: 2010* 13 (2012), https://www2.census.gov/library/publications/decennial/2010/cph-2/cph-2-10.pdf#page=33.

by troops carrying high-powered weapons. Overnight the friendly neighborhood became a menacing occupation zone."[6] Moreover, the city's mayor ordered a citywide curfew and declared a state of emergency for more than two weeks after January 6.[7] Thousands of National Guardsmen—ultimately, tens of thousands—"streamed into the region" in the days after January 6 and leading up to the Inauguration.[8]

And the aftershocks of January 6 continue to reverberate. A year after the events, residents express that the experience has changed them, reporting that they are "still reliving trauma," feeling like they are "on pins and needles," and believing that "there is a real possibility of more violence."[9] A poll survey further demonstrates that these are not isolated feelings held by a few residents. According to the survey prepared at the request of counsel for Thomas Caldwell and Connie Meggs, two defendants in Case No. 21-cr-028,[10] a significantly higher portion of D.C. residents experienced concern about their own safety or the safety of people important to them, and additionally felt targeted by the events than residents in three other districts.

---

[6] Joe Heim, *As Jan. 6 anniversary approaches, fear, disbelief and anger still felt in Capitol Hill neighborhood*, WashingtonPost.com (Jan. 4, 2022), https://www.washingtonpost.com/dc-md-va/2022/01/04/capitol-hill-neighborhood-jan6-attack-insurrection/.

[7] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today%E2%80%99s-public-emergency-15-days-a1.

[8] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden inauguration*, The Hill (Jan. 15, 2021), https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.

[9] *"It Was An Attack On Our Hometown": How 11 Washingtonians Remember The Insurrection*, DCist.com (Jan. 5, 2022), https://dcist.com/story/22/01/05/dc-locals-jan-6-capitol-insurrection-anniversary.

[10] A full summary of the survey ("Ex. A") is filed as an exhibit with this motion. The survey compares responses by potential jurors in the District of Columbia, with potential jurors in three other federal judicial districts: the Middle District of Florida – Ocala Division, the Eastern District of North Carolina, and the Eastern District of Virginia.



Ex. A, Figure 3c and 3d.

The small jury size and the personal impact of the events distinguishes this case from *Skilling*. The Court in *Skilling* concluded that the size and characteristic of the community weighed against presumptive prejudice because "more than 4.5 million individuals eligible for jury duty resided" in the Houston area and there was a "large, diverse pool of potential jurors." *Id.* In contrast, the voting age population in this District is under 550,000 – approximately 12% of that in the Houston area. Moreover, the population in this District is more homogenous, at least in the way they voted in the last presidential election. President Biden received more than 92 percent of the vote in the 2020 Election in this District.[11] While political leanings, by themselves, are not reasons to disqualify jurors, this characteristic of the District certainly heightens the risk of prejudice in a case like this one, where Mr. Holdridge

---

[11] *General Election 2020: Certified Results*, D.C. Bd. of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

7

is accused of attempting to prevent the certification of President Biden's electoral college results. This homogeneity impacts the likelihood that the perceived motives of those who voted for Mr. Trump will be unfairly ascribed to Mr. Holdridge individually, and it limits the potential that he will be judged by a diverse group of his peers.

*United States v. McVeigh* is more instructive. There, the court found that the jurors in the local community could not be fair and impartial because of their personal connection to the event. 918 F. Supp. 1467 (W.D. Okla. 1996). The defendants were accused bombing a federal building in Oklahoma City, which resulted in a deadly explosion. *Id.* at 1469. The court concluded that there was so great a prejudice against the defendants in the entire state of Oklahoma that they could not obtain a fair and impartial trial in the state. *Id.* at 1474. In reaching this conclusion, the court noted "[t]he immeasurable effects on the hearts and minds of the people of Oklahoma from the blast and its consequences," and considered, among others, Oklahomans' sense of loss and grief from a crime that occurred in their own state and their pride of accomplishment in overcoming a tragedy. *Id.* at 1470-72. While the people of Oklahoma were well deserving of their pride, the Court explained that "it is easy for those feeling pride to develop a prejudice," and cautioned that "[t]he existence of such a prejudice is difficult to prove," and "[i]ndeed it may go unrecognized in those who are affected by it." *Id.* at 1472.

The same reasoning applies here. In light of the personal impact that the events of January 6 has had on the D.C. residents, it is hard to imagine that they

8

have not developed a prejudice against the defendants charged of being involved in the January 6 events even if they are not consciously cognizant of the prejudice. Moreover, it is even harder to imagine that they would not have developed stronger prejudice in recent days with the primetime broadcasting of House Select Committee hearings, which have been airing the most violent and graphic portions of the events of January 6 and have reminded the residents of the District of the impact that January 6 has had on them and their community.

In short, both "the size and [the] characteristics of the community" lend strong support that there is a presumption of prejudice in this District, which would prevent a fair trial.

## B.   Media coverage of the events of January 6 has been relentless and highly graphic, and it has been particularly focused in this District.

The media coverage of the events of January 6, as well as subsequent investigations and hearings, have been pervasive and emotionally charged. And although the news has been broadcast nationally, it has been more persistent and widespread in this District. The Federal Public Defender-commissioned a survey comparing the potential jury-eligible population in this District and the Northern District of Georgia and comparing the media coverage in the two markets.[12] According to this analysis, the Washington Post, the dominant newspaper in this District, ran approximately twice as many stories about January 6 than the Atlanta Journal-Constitution, the dominant newspaper in Atlanta, between January 2021

---

[12] A full summary of the survey ("Ex. B") is filed as an exhibit with this motion.

and January 2022. Ex. B at 9, ¶ 28. This difference in coverage was not limited to print media. Network television affiliates in this District mentioned January 6 at a significantly higher rate than those in Atlanta during this same time period. *Id.* at 10, ¶ 31.

Juror exposure to news accounts alone does not "presumptively deprive[] the defendant of due process." *Murphy*, 421 U.S. at 799. However, if the news stories contain "information of the type readers or viewers could not reasonably be expected to shut from sight," then presumption of prejudice arises. *See Skilling*, 561 U.S. at 382. That is exactly what has happened here. For example, on the first day of the House Select Committee's primetime hearing, the committee broadcast a presentation that was carefully and dramatically staged for maximum effect. This presentation included testimony with graphic details and a dramatic 11-minute video montage with President Trump's voice playing over it.[13] This is hardly like "the straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations" that the court examined in *United States v. Haldeman*. 559 F.2d 31, 61 (D.C. Cir. 1976).

The event has also been compared to once-in-a-lifetime disasters by prominent politicians. For example, at a one-year anniversary observance:

> [Vice President Kamala] Harris compared the Jan. 6 insurrection to two other dates when the United States came under attack: Dec. 7, 1941, when the Japanese bombed Pearl Harbor, and Sept. 11, 2001, when

---

[13] Mike DeBonis, *Jan. 6 committee uses video, testimony to tell tale of the insurrection* (Jun. 10, 2022), https://www.washingtonpost.com/national-security/2022/06/09/jan-6-committee-uses-video-testimony-tell-tale-insurrection/.

terrorists turned commercial airplanes into missiles and attacked the World Trade Center and the Pentagon.

"Certain dates echo throughout history, including dates that instantly remind all who have lived through them where they were and what they were doing when our democracy came under assault," Harris said. "Dates that occupy not only a place on our calendars but a place in our collective memory."[14]

Such press coverage "likely imprinted indelibly in the mind of anyone who watched it," resulting in a prejudgment of Mr. Holdridge's case. *Skilling*, 561 U.S. at 382.

Prejudicial views about the intentions of January 6 defendants are not confined to D.C., but they are significantly more negative here. According to the survey commissioned by the Federal Public Defender, 63 percent of national respondents and 68 percent of Atlanta division respondents said they would describe the actions of "people who forced their way into the U.S. Capitol on January 6, 2021," with the phrase "Trying to overturn the election and keep Donald Trump in Power."[15] Far more D.C. residents—85 percent—said the same.[16]

Moreover, the majority of D.C. residents have prejudged the guilt of January 6 defendants who have been criminally charged, like Mr. Holdridge. Residents of both this District and the Northern District of Georgia were asked for their "Opinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges

---

[14] Annie Linskey, *Biden goes after Trump for lies and self-aggrandizement in Jan. 6 insurrection anniversary speech*, WashingtonPost.com (Jan. 6, 2022), https://www.washingtonpost.com/politics/biden-goes-after-trump-for-lies-and-self-aggrandizement-in-jan-6-insurrection-anniversary-speech/2022/01/06/fdb39c14-6eff-11ec-aaa8-35d1865a6977_story.html.

[15] Ex. B at 4–5.

[16] *Id.*

brought against them."[17] Among Georgia respondents, 54 percent answered "Guilty," 10 percent said "Not guilty," and the remaining 36 percent volunteered a response recorded as either "Depends" or "Don't know/refused."[18] Respondents in this District, however, were *much more convinced* of defendants' guilt and *much less ambivalent* in their answers: 71 percent said "Guilty"; just 3 percent said "Not guilty"; 16 percent volunteered a response recorded as "Depends"; and 10 percent volunteered a "Don't know/refused" response.[19]

This result was replicated in another survey comparing the residents of this District to those in three other districts: Middle District of Florida—Ocala Division, Eastern District of North Carolina, and Eastern District of Virginia. This survey also revealed that D.C. residents displayed significantly higher bias and prejudgment against January 6 defendants. When asked whether the respondent is more likely to find a defendant charged with crimes for January events guilty or not guilty, over 70% of D.C. residents said guilty, whereas only 37-48% residents from the other three districts said they would similarly find guilty. It is particularly telling that over 70% of the D.C. residents responded "guilty," even though they were given an option to state "too early to decide":

---

[17] *Id.* at 7.

[18] *Id.* The only answers the question provided were "Guilty" and "Not guilty." Among the 36 percent who volunteered a different answer, 19 percent gave a "Depends" response, and the other 17 percent, a "Don't know/refused" response. *Id.*

[19] *Id.*



Ex. A, Figure 1a.

In short, this is a case in which "a pattern of bitter prejudice throughout the community . . . render[s] the voir dire an unsatisfactory device for selection of an impartial jury." *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976). The jury pool in this District, especially, will comprise "readers or viewers [who] could not reasonably be expected to shut from sight" what they have read and seen. *Skilling*, 561 U.S. at 382. In those circumstances, prejudice should be presumed; in fact, prejudice is plainly apparent in the survey responses of the large majority of D.C. residents who already have decided that defendants with charges like Mr. Holdridge's are guilty.

**C.**   **In light of the persistent media coverage and investigations into the events of January 6, 2021, the passage of time has not weakened presumed prejudice.**

In *Skilling*, the Supreme Court noted that the argument for presumed prejudice was weakened by the passage of time: "[O]ver four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." 561 U.S. at 383. *Skilling* does not provide a useful analogy. Although a year and a half has passed, the reckoning over January 6 continues to generate front-page news. In fact, media coverage has increased in recent days with the public hearings held by the House Select Committee, and it will likely continue to do so. Furthermore, entertainment media has produced new content, including documentaries by several major media companies.[20] At the same time, criminal prosecutions are progressing in the public eye, receiving widespread coverage. In short, the passage of time has not weakened the prejudice that Mr. Holdridge faces in this case.

For all the reasons discussed above, "voir dire [would be] an unsatisfactory device for selection of an impartial jury." *Ehrlichman*, 546 F.2d at 916 n.8. And since a presumption of prejudice is warranted here, this proceeding must be transferred to another district to comply with Rule 21 and the Fifth and Sixth Amendments' guarantees of due process and a fair trial by an impartial jury.

---

[20] *See, e.g.*, *Four Hours at the Capitol* (HBO 2021), https://www.hbo.com/documentaries/four-hours-at-the-capitol; *24 Hours: Assault on the Capitol* (ABC News 2021), https://www.hulu.com/series/24-hours-assault-on-the-capitol; *Day of Rage* (N.Y. Times 2021), https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

III.   **If the Court were to deny a transfer of venue, then expanded examination of prospective jurors before and during formal voir dire would be crucial to mitigate actual prejudice.**

If the Court concludes that prejudice should not be presumed or cannot yet determine whether it should be, then the parties' opportunity for expanded examination of prospective jurors is absolutely essential for a fair trial. *See Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*."). For instance, although the Supreme Court did not find presumed prejudice in *Skilling*, it acknowledged that "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," and noted approvingly that the district court's "extensive screening questionnaire and follow-up *voir dire* were well suited to that task." 561 U.S. at 384.

Views prejudicial to Mr. Holdridge's defense are so widespread in this District's jury pool that empaneling a sufficiently impartial jury might not be possible. But if it *is* possible, such a jury could be identified only through expanded examination that allows the parties a thorough opportunity to explore individual prejudices. To accomplish that, Mr. Holdridge would ask the Court to permit the three devices described in the introduction to this motion: (1) a questionnaire to be sent, after review and approval by the Court, to summoned prospective jurors; (2) the right for the parties to be present during any pre-screening questioning the Court conducts before formal voir dire; and (3) individual questioning during voir dire by the parties as well as the court. The facts that show why these measures are necessary are the

same facts relied upon in Part II of this motion. Those facts—relating to the District's characteristics, pretrial media coverage, and the undissipated immediacy of January 6, 2021—demonstrate an undeniable and intolerable risk that actual prejudice would prevent a fair trial, regardless of whether the Court concludes that the facts establish presumed prejudice.

## IV.   Conclusion

For the foregoing reasons, Mr. Holdridge respectfully moves the Court to transfer these proceedings to another district or, in the alternative, to allow expanded questioning of prospective jurors as set out above.

Dated:     June 13, 2022                     Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S
WHAYEUN (CHLOE) KIM
GABRIELA BISCHOF
Assistant Federal Public Defenders