**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No: 1:21-cr-00729-RBW** |
| **v.** | : | |
| | : | |
| **BRENT JOHN HOLDRIDGE,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Brent John Holdridge to 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

## I.  Introduction

Defendant Brent John Holdridge participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Defendant Holdridge pleaded guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G). As

---

[1] Although the Statement of Offense in this matter, filed on August 4, 2022, reflects a sum of more than $1.4 million for repairs (ECF 45 at ¶ 6), as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

explained below, a sentence of 60 days of incarceration is appropriate in this case because Holdridge has a deplorable criminal history and on January 6 he acted in accordance with his longstanding disregard for the law.  Specifically, upon his arrival at the west side of the U.S. Capitol that day, he saw the plastic fencing and barricades erected on the Capitol Grounds, as well as law enforcement officers dressed in full riot gear.  Despite those obvious signs that the Capitol was off-limits, Holdridge entered the Capitol Grounds and proceeded to climb atop the railing at the north exterior staircase to the Upper West Terrace and wave a flag bearing the "Punisher" logo for several minutes while other rioters scaled the concrete wall and climbed over the railing directly at his feet.  After making his way up the staircase, Holdridge entered the Capitol building through the Senate Fire Door and then walked into the Parliamentarian's Office, where he sat in a desk chair and appeared to photograph other rioters with his cell phone as they ransacked the office.  In total, the defendant spent approximately five minutes inside the Capitol building.

The Court also must consider that Holdridge's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers and disrupt the proceedings.  Here, the facts and circumstances of Holdridge's crime and his reprehensible criminal history support a sentence of 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 46 (Statement of Offense) at ¶¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most

violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Holdridge's conduct and behavior on January 6.

*Defendant Holdridge's Role in the January 6, 2021 Attack on the Capitol*

Holdridge was a fugitive from a sentence of incarceration when he traveled to the Capitol in time to join the January 6 riot: he had failed to report as ordered to the Humboldt County (California) Jail by December 5, 2020, to begin serving a sentence that was imposed in October 2020. ECF 1-1 (Statement of Facts attached to Complaint) at 5. He had been granted permission to travel to Louisiana in the interim to visit his ailing mother. *Id.* Even after his mother passed away on December 17, 2020, however, he chose to travel to the Capitol, where he would participate in the riot, rather than to California to serve his sentence. *Id.*

Holdridge knew the Capitol was under siege when he approached it. He saw the plastic fencing and barricades erected on the Capitol Grounds, as well as law enforcement officers dressed in full riot gear. ECF 46 at ¶ 8. He used his cell phone to take photos or videos of those officers as they filed past him:



A video clip of Holdridge recording the squad of riot police is Exhibit 1 to this memorandum.[2]

After watching those officers march past him, Holdridge advanced toward the Capitol building. The following images show him after he climbed atop the railing at the north exterior staircase to the Upper West Terrace, where he stood and waved a flag bearing the "Punisher" logo for several minutes while other rioters scaled the concrete wall and climbed over the railing at his feet. ECF 46 at ¶ 8; ECF 1-1 at 7.

 

[2] Two video exhibits will be provided to the Court on a disc upon the filing of this memorandum. Copies will be provided to defense counsel via the USAfx file-transfer system.



After ascending the stairs, Holdridge entered the Capitol building through the Senate Fire

Door and walked into the Parliamentarian's Office.  ECF 46 at ¶ 8.



In the Parliamentarian's Office, he sat at a desk and appeared to photograph or record videos of other rioters who were ransacking the office.  The images below are taken from a video that is Exhibit 2 to this memorandum.  The video shows Holdridge (indicated by the red oval) and the scene he appeared to be filming.



As shown in the images below recorded by a Capitol surveillance video camera, Holdridge spent about three minutes in the Parliamentarian's Office (entering at 2:47 p.m. and exiting at 2:50 p.m.).





Holdridge exited the Capitol building through the Senate Fire Door about two minutes later.



*Defendant's Interview*

On September 29, 2021, an FBI agent interviewed Holdridge at the Humboldt County Probation Department in Eureka, California. Holdridge confirmed that on January 6, 2021, he arrived at the U.S. Capitol from the west side and observed the plastic fencing and barricades set up outside on the Capitol grounds, as well as law enforcement dressed in full riot gear. He stated that when he arrived law enforcement had begun deploying "tear gas" as people were making their way up the Capitol stairs and into the building. He refused to answer whether or not he entered the Capitol building, and stated that he did not steal anything, touch or assault anyone, or damage any property while he was at the Capitol that day. When the FBI agent showed Holdridge an image taken from U.S. Capitol surveillance video on January 6, 2021, of a man standing on the railing of the staircase to the Upper West Terrace of the Capitol with a flag in his hand, he refused to identify anyone in the photo, but stated that he purchased the flag shown in the photo from a

vender who was at the "Stop the Steal" rally.  ECF 1-1 at 7.  Holdridge admitted taking photographs at the Capitol but said he did not know the names of the locations where he took the photographs.

*The Charges and Plea Agreement*

On November 29, 2021, the United States charged Holdridge by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On December 2, 2021, law enforcement officers arrested him in California.  On December 13, 2021, the United States charged him by information with the same offenses charged in the complaint and, on August 4, 2022, he pleaded guilty, pursuant to a written plea agreement, to Count Four of a Superseding Information charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  As part of the plea agreement, Holdridge agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Holdridge now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Holdridge faces up to six months of imprisonment and a fine of up to $5,000.  Holdridge also must pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  Because this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include:  the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the United States Capitol on January 6, 2021, posed a grave danger to our democracy." *United States v. Munchel,* 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters."  *United States v. Judd,* 21-cr-40, WL 6134590 at *5 (D.D.C. Dec. 28, 2021). While assessing Holdridge's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Holdridge, the absence of violent or destructive acts is not a mitigating factor.  Had Holdridge engaged in such conduct, he would have faced additional criminal charges.

As Exhibits 1 and 2 show, Holdridge could not have mistaken the events of January 6 at the Capitol as anything other than a riot.  Despite the mayhem he saw on his approach to the Capitol building, he climbed the stairs and stood on the railing with his Punisher flag, joined the mob entering the building, and had a seat in the Senate Parliamentarian's Office for several minutes while filming its desecration by other rioters.  The nature and circumstances of Holdridge's offense call for a sentence of incarceration.

### B.  The History and Characteristics of Holdridge

Holdridge, age 56, has had an extraordinary career—in crime.  It began at age 18, in 1984, with convictions for "Grand Theft: Property" and "Trespass: Injured Property."  Presentence Investigation Report ("PSR") at ¶¶ 25-26.  His first prison sentence came in 1989, PSR at ¶ 29, and he has never broken the habit of breaking the law.  He has at least 28 criminal convictions, including numerous felonies, spanning more than 38 years, and he has been sentenced to prison or jail at least 13 times—most recently in May 2021.  PSR at ¶¶ 25-43.  Most of his convictions involved drug-trafficking or firearm or other weapons offenses.  *Id.*  One of his more troubling convictions is for "Willful Child Cruelty: Poss Injury/Death."  PSR at ¶ 32.  And he was on the run from a jail sentence when he participated in the Capitol riot.  PSR at ¶ 42.  In short, Holdridge's criminal history demonstrates his complete refusal to abide by the law his entire adult life, even after repeated sentences of incarceration.

Although Holdridge agreed to speak with an FBI agent about his presence at the Capitol on January 6, he was not entirely forthright about his activities that day.  For example, he refused to state whether he entered the Capitol building, and he refused to identify himself in a photograph of him standing on the railing of the staircase to the Upper West Terrace.[3]  Moreover, the timing of Holdridge's decision to plead guilty (just 46 days before trial) required the government to allocate substantial resources to trial preparation.

It gets worse:  after pleading guilty and while awaiting sentencing in this matter, Holdridge failed to report on four different occasions for drug testing as ordered by this Court and directed

---

[3] Where a defendant does not invoke his right to remain silent, "the prosecution's use of his noncustodial silence [does] not violate the Fifth Amendment."  *Salinas v. Texas*, 570 U.S. 178, 186, 133 S. Ct. 2174, 2180 (2013).

by his probation officer.  ECF 51 (Pretrial Violation Report) at 2.  The first of those failures to

report was at his own home, to which the probation officer had made a five-hour (one-way) drive.

*Id.*  Holdridge is a scofflaw and should be sentenced accordingly.  His participation in the riot was

yet another demonstration of his contempt for law and order.  His recent, serial disregard for this

Court's conditions of release serves as an exclamation point at the end of a lifelong manifesto that

he is above the law.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The

violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the

democratic process."[4]  As with the nature and circumstances of the offense, this factor supports a

sentence of incarceration.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH,

Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any

presumption of probation.  I think the presumption should be that these offenses were an attack on

our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

2010).

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have:  the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Holdridge's lengthy criminal history and his participation in the riot while a fugitive from a custodial sentence demonstrate that a sentence of incarceration is necessary to deter him from committing future offenses.  When the California court trusted him to report to serve his sentence at the end of 2020, he instead absconded and went to Washington to join the riot, thereby demonstrating that judicial leniency simply emboldens him to commit additional crimes.  Similarly, when this Court trusted Holdridge to comply with his bond conditions while he remained at liberty pending sentencing, he abused that trust by failing four times to appear for drug

testing as directed by his probation officer. *See* ECF 51. His sentence in this case must be sufficient to deter him from continuing to disregard the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Holdridge based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct:  his participation in the January 6 riot.

Holdridge has pleaded guilty to Count Four of the Superseding Information charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . .  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Section 3553(a)(6) does not limit the sentencing court's broad

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." *Id.* Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases

as the closest "comparators" when assessing unwarranted disparity.  But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records.  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id.* at 1095.  It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases.  *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity.  Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years.  For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted

disparity given the narrow range of permissible sentences.  The statutory range for a petty offense is zero to six months.  Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

With that backdrop, two cases may be useful comparators.  One is *United States v. Robert Packer*, No. 21-cr-103 (CJN).  There, the defendant pleaded guilty to the same charge as Holdridge.  Like Holdridge, Packer saw the police and barricades outside the Capitol before climbing the northwest stairs and entering the Senate Wing of the building.  Like Holdridge, Packer entered a private office inside the building.  Like Holdridge, Packer had a decades-long criminal record including numerous convictions.  Packer was inside the Capitol building about 30 minutes longer than Holdridge, and Packer ventured further into the building that Holdridge.  Although Packer was not completely candid in his FBI interview, he at least admitted he entered the building, which Holdridge refused to do.  The government recommended a sentence of 75 days' incarceration, and the court sentenced Packer to a sentence of imprisonment of 75 days.

Another example is *United States v. Anthony Vuksanaj*, No. 1:21-cr-620 (BAH), where the defendant also pleaded guilty to the same offense as Holdridge.  Like Holdridge, Vuksanaj recorded videos while walking through the Capitol, without engaging in specifically aggressive or destructive behavior (beyond contributing to the mayhem with his presence).  Vuksanaj spent more time in the building than Holdridge (40 minutes versus about five), but did not film the ransacking of the Parliamentarian's Office as Holdridge did.  Vuksanaj had several firearms in his bedroom when he was arrested, and had eight prior convictions but only one felony conviction (for possession of a loaded firearm), compared to Holdridge's 28 convictions, including numerous felonies, that he accumulated during his long career as an armed drug trafficker and thief.  The government sought a sentence of three months' incarceration and 36 months' probation.  The court imposed a sentence of 42 days of intermittent confinement (to be served in three 14-day periods), three months of home detention, three months of probation, and a criminal fine of $2,000 (in addition to $500 in restitution).

As shown by the foregoing discussion, there are infinite combinations of aggravating and mitigating sentencing factors among Capitol Riot defendants—especially because "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  Moreover, § 3553(a)(6) is aimed at avoiding "unwarranted sentence disparities among defendants *with similar records* who have been found guilty of similar conduct," (emphasis added) and Holdridge's 28 prior convictions greatly reduce or eliminate the risk of such a disparity.

## V.       The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, No. 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, No. 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, No. 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Revlett*, No. 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, No. 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Ticas*, No. 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022); *United States v. Caplinger*, No. 21-cr-342 (PLF), ECF 74 (D.D.C. August 1, 2022).[6]  In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

---

[6] In *United States v. Lindsey*, No. 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G).  Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

**A. A sentence imposed for a petty offense may include both incarceration and probation.**

*1.  Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[8] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part B *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

## 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by

probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.*

("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress

24

enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), ECF 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense

case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.   Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).   *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.   For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.   *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).   Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).   Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).   No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.   Holdridge pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G):  Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.   *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

> **B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

> *1.  Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[9]

> *2.  Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Holdridge to 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Holdridge's liberty as a consequence of his participation in the riot and his life of crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Joseph DeGaetano*
Joseph DeGaetano
TN Bar No. 021448
Assistant United States Attorney
District of Columbia
Capitol Riot Detailee
555 4th Street, NW
Washington, D.C. 20530
(423) 385-1345
Joseph.Degaetano@usdoj.gov

## CERTIFICATE OF SERVICE

On this 14th day of November, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

s/ *Joseph DeGaetano*
Joseph DeGaetano
Assistant United States Attorney