**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cr-00729-RBW |
| | ) | |
| BRENT JOHN HOLDRIDGE | ) | |

**<u>DEFENDANT'S SENTENCING MEMORANDUM</u>**

## I.    INTRODUCTION

In October 2020, Brent Holdridge received permission to move to Louisiana to care for his dying mother. Mr. Holdridge, who has received social security disability benefits since at least 2011 due to intellectual disabilities,[1] and who has also been diagnosed with depression, anxiety, and panic disorder, found himself in a particularly vulnerable state of mind during his mother's final months. While together in Louisiana, he and his mother often watched political television shows and internet videos. Mr. Holdridge, who had not previously had a serious interest in politics, found himself obsessing over the videos he found on the internet. The political talk also facilitated a new friendship with the technician who managed his mother's oxygen. It was during this time that Mr. Holdridge, who did not vote for Donald Trump, came to sincerely believe the conspiracy theories that the election had been stolen due to voter fraud. Mr. Holdridge's mother died in December 2020 and he found himself adrift. His oxygen technician friend planned to go to the "Stop the Steal" rally in Washington D.C. but his travelling companion had fallen through, so Mr. Holdridge volunteered to go with him at the last minute.

---

[1] Mr. Holdridge suffers from learning disabilities including severe dyslexia which prevent him from reading and writing fluently.

Mr. Holdridge's ultimate participation in the riot was in no way premeditated. He was acting only as an individual who believed he would observe a peaceful protest and intended only to stand up, be counted, and witness history. His preparation for the trip was consistent with that belief.  Mr. Holdridge was not, and has never been, a member of any organized political or radical entity – he was not an Oath Keeper, a Proud Boy, or even a supporter of Donald Trump. He did not make inflammatory statements on social media in anticipation of the trip, and did not "prepare" by bringing weapons, gas masks, two way radios, or other similar supplies.

Mr. Holdridge's conduct once in the Capitol was nonviolent and nondestructive. He walked around recording constantly but did not take any selfies or posed photographs that made light of the situation. While he was inside the Capitol building, Mr. Holdridge did not commit any violent acts; did not possess any weapon, did not threaten any person; did not harass or provoke any law enforcement personnel; did not damage any property; and did not join any particular group of other persons. When he encountered rioters who were destructive, he did not encourage violence or vandalism in any way, instead, he made a point to leave the building altogether. He was in the Capitol for approximately 5 minutes in total.

After the riot, he did not brag about his involvement on social media, vow future similar actions, or otherwise show a lack of remorse. He left the riot disillusioned about the rioters he had joined. Those rioters did not want to eliminate corruption within the government, they simply wanted to see Donald Trump installed as President, whatever it took. Mr. Holdridge saw that his aims were not a match with theirs.

Mr. Holdridge took responsibility for his conduct. He confided in his Probation Officer that he had been at the Capitol on January 6, 2021, which led to a

consensual interview with FBI agents during which Mr. Holdridge admitted he had been at the Capitol although he declined to say whether he went inside. He also gave the interviewing officers his phone and permission to look through it for any photos or video he took on January 6, 2021. On August 4, 2022, Mr. Holdridge pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G), a Class B misdemeanor. He will be before the Court for sentencing on December 2, 2022.

The Court should weight Mr. Holdridge's intellectual disability and consequent vulnerability to misinformation, his lack of knowledge of or preparation for a violent event, his nonviolent, nondestructive conduct during his brief time in the Capitol building, his disillusionment after entering the Capitol on January 6, and the collateral consequences[2] of a sentence of incarceration would have on him. In light of all those factors, Mr. Holdridge respectfully requests that the Court sentence him to 36 months of probation, $500 restitution, and no fine.

## II.    BACKGROUND

### A.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Brent Holdridge was born in Fulton, California. PSR ¶¶ 70-71. He had a loving family, and adored his parents especially. *Id.* From a young age, it was clear that he had intellectual disabilities. ¶ 79. His parents moved him from school to school, trying to find somewhere that could help him, but his dyslexia is so severe that he never learned to read or write fluently. *Id.* Medical records provided to Probation and the government reflect his long history of learning disabilities: "Pt reports having severe dyslexia which lead to him changing schools frequently

---

[2] As set forth below, a sentence in excess of 29 days incarceration will likely result in the loss of Mr. Holdridge's residence, a rented room.

growing up due to parents trying to find a school that could help him. Reading Is quite difficult for him. Continues to affect his ability to work."

From the time he was 13 years old, Mr. Holdridge suffered from a drug addiction that broadened and intensified throughout his adult life and resulted in a significant criminal record. *See e.g.* ¶¶ 80; 29, 32, 35-37; 41-43.

By at least 2011, Mr. Holdridge was awarded Social Security Disability benefits due, at least in part, to his intellectual disabilities. ¶ 87. The years that followed have been very difficult. In approximately 2013, Mr. Holdridge's beloved wife suffered a stroke and became seriously disabled. ¶ 72. He and his youngest son cared for her for the greater part of three years, and Mr. Holdridge was with her when she passed away in 2016. *Id.* In 2018, his father died of a heart attack. ¶ 70. Mr. Holdridge's health declined as well; he currently suffers from congestive heart failure, high cholesterol, high blood pressure, asthma, and degenerative disc disease. ¶ 76.

In 2020, his mother began to seriously decline. Mr. Holdridge had been given permission by his probation officer to reside in Louisiana until December 5, 2020. On December 5, 2020, his mother was still alive. His failure to return to California to report to Probation was not related to his travel to Washington D.C. on January 6, 2021, but rather occurred as a result of his desire to be with his mother in her final days and attend to her final wishes. He understood that he would have to serve time as a result of his failure to return. He did return to California in

4

February 2021 of his own accord where he was promptly arrested and returned to custody. ¶ 43.

### B. Nature And Circumstances of the Offense

Mr. Holdridge's crime in the Capitol was not premeditated, did not involve violence or destruction or verbal incitement of violence or destruction, and was limited in duration. He did not attempt to glorify the activity with glib selfies or by livestreaming or YouTube-ing. He was cooperative when interviewed by FBI agents and did not lie to them, and made no statements indicating a lack of remorse or desire to repeat his unlawful conduct.

As set forth above, Mr. Holdridge first became interested in politics during his mother's final months and made the regrettable decision to attend the January 6, 2021 "Stop the Steal" rally on the spur of the moment when a friend's traveling companion canceled. Mr. Holdridge and his friend drove from Louisiana and stayed in an AirBnB. Mr. Holdridge, who had no connection to any organization sponsoring the rally, had no weapons, no gas mask, no two-way radio, and no inkling of what was to come. After they arrived at the rally, Mr. Holdridge learned for the first time that protestors planned to march to the Capitol. He made the catastrophic decision to join in. He parted ways with his friend and walked.

On his way, he saw law enforcement officers dressed in riot gear, plastic barricades, and smelled tear gas. Mr. Holdridge's phone was his constant companion. He recorded nonstop and did very little else; in every capture he is seen with his

phone camera in his hand. Dkt. 59, 3-8. Although he was recording constantly, Mr. Holdridge had no internet following to whom he was broadcasting and trying to incite.

After he entered the Capitol grounds, Mr. Holdridge navigated the dense crowd with varying degrees of success. At one point, he walked along the edge of the Upper West Terrace railing trying to make his way through. Mr. Holdridge stood on the railing holding a flag and his phone for a couple of minutes as he tried to walk through. A video clip of Mr. Holdridge navigating the railing is attached as Exhibit A to this memorandum. Mr. Holdridge first appears 24 seconds into the video.

Insurrectionists first breached the Senate door and north side door of the Upper West Terrace at 2:20 p.m. Approximately 25 minutes later, well after the door had been breached, Mr. Holdridge entered the Capitol Building through the Senate Fire Door. He entered the Parliamentarian's office immediately and sat down in a chair. As he continued to record the riot on his phone, he became aware that rioters around him were vandalizing the office. Instead of encouraging the violence, taking a selfie in the Parliamentarian's office, or participating in the vandalism, Mr. Holdridge then realized his error in entering the Capitol building at all. He exited the Parliamentarian's office three minutes after he'd entered, and, despite the thick influx of rioters entering the building and slowing his exit, exited the building entirely within two more minutes. As he exited, he spoke respectfully with a uniformed Capitol Police officer. He did not harass or threaten any officer during his time at the Capitol. He was in the Capitol building for approximately five minutes.

C.  POST OFFENSE CONDUCT

After the riot, Mr. Holdridge did not give media interviews, make inflammatory statements on social media, or vow further illegal action. He returned to Louisiana, finalized his mother's estate, and in February 2021, returned to California. He was promptly arrested. ¶43. After his release, he maintained good contact with his probation officer and in July 2021, confided in him that he'd been at the Capitol on January 6, 2021. That disclosure led to a voluntary interview with the FBI on September 29, 2021. He also admitted to the FBI that he had been at the Capitol on January 6, 2021, but refused to say whether he'd been inside the Capitol building. The agents showed him a picture of rioters on the Upper West Terrace; the image included Mr. Holdridge holding a flag. Although Mr. Holdridge could not name anyone else in the photo, contrary to the government's assertion, he identified himself and stated that he had purchased the flag he was holding in Washington D.C. because the "blue line" on the masked Punisher image was a way to honor his late father in-law who had been a police officer. Moreover, he gave the agents his phone and permission to review all the pictures or videos taken on January 6, 2021.

Presently, Mr. Holdridge lives in a single room in a home in Arcata, California. ¶ 75. He receives $936.19 in social security disability benefits monthly. ¶ 87.  His rent is $800 per month, which is a reasonable amount for a single room in the area. ¶ 89b. He has two fully nonoperational vehicles, and one vehicle which needs significant repairs and is not safe to drive, although he occasionally does drive it short distances. *Id.* His monthly cash outflow exceeds his monthly cash inflow by $890. *Id.*

Mr. Holdridge's violation of pretrial release is not indicative of a broader lack of compliance or desire to circumvent the law. In August 2022, Mr. Holdridge was supposed to meet with his Pretrial Services Officer at his home. He informed her that he was sick, and she said she may not visit due to his illness. As a result, he believed she was not coming and went to a sweat lodge for treatment on the day of her visit and was not home at the appointed time. Because the drive is over five hours, Pretrial requested that Mr. Holdridge then report to their San Francisco office. Mr. Holdridge scheduled multiple follow-up visits but was unable to report because his car could not make the drive, he had no funds for a bus ticket and hotel, and the friend who agreed to drive him developed Covid-19.[3]  In November 2022, Pretrial visited Mr. Holdridge at his home in Arcata, but opted not to drug test him. He has not violated his drug testing condition or refused to be tested since the commencement of Pretrial Release.[4] He remains in good standing with his Humboldt County Probation officer and has suffered no violations in that jurisdiction since the commencement of pretrial supervision.

## III.   ARGUMENT

A sentencing court's "overarching duty" is to "impose a sentence sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in §

---

[3] Undersigned counsel provided a copy of medical paperwork documenting the Covid-19 diagnosis to Pretrial Services.

[4] Originally, Mr. Holdridge's drug testing condition specified that he would be drug tested by his Humboldt County Probation Officer and the results would be reported to Pretrial Services. The Court amended the condition at the change of plea to require drug testing by Pretrial Services.

3553(a)(2)." *Pepper v. United States*, 562 U.S. 476, 491 (2011) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7). Here, a sentence of 36 months of probation best serves the purposes of punishment and prevents unwarranted sentencing disparities.

A.  <u>A Sentence of Probation Best Serves the Purposes of Punishment</u>

A custodial sentence is not necessary to adequately punish Mr. Holdridge, to deter him or others from similar conduct, and to provide necessary treatment in the most effective manner. Mr. Holdridge's conduct was absolutely wrong, unlawful, and dangerous to our democracy. But it is nevertheless important to view that conduct on the continuum it occurred on, and Mr. Holdridge's conduct was undoubtedly at the most mitigated end of that continuum. Where a defendant causes no violence or destruction, does not encourage others to do so in any way, and promptly removes himself from the vandalism occurring near him, a term of imprisonment is not

9

necessary to demonstrate the seriousness of the offense. A term of supervision is also a punishment, and here, adequately reflects the seriousness of the offense in the broader context.

The government points to Mr. Holdridge's admittedly extensive criminal history as a factor that should aggravate his sentence in this case, presumably because criminal history makes a defendant more likely to recidivate. But unlike in most criminal cases, Mr. Holdridge's prior criminal history had no obvious connection to his conduct in this case. Where a defendant has previously committed a drug sale and then is convicted of another, it is easy to see how the individual has failed to learn the Court's lesson and an escalated sentence is warranted. Here, conversely, Mr. Holdridge's conduct was wholly unrelated to any prior criminal conduct. He has no prior arrests or convictions involving protests, assaults, or any conflict with the police – including evading, resisting, obstructing or delaying. He has a great deal of respect for law enforcement because his father-in-law was a police officer, and has maintained a respectful relationship with his Humboldt County probation officer. According to medical records, his drug addiction, which drove his previous criminal history, was in early remission around the time of this incident.

Moreover, his conduct is itself evidence that he is already deterred. The government's argument for a 60 day sentence in this case is based on little more than Mr. Holdridge's prior criminal history. *See* Dkt. 59 at 1-2, but the government does also make the point that Mr. Holdridge videoed other rioters vandalizing the Parliamentarian's office, but that argument does not take into account that 1) Mr.

Holdridge did not ever stop recording his surroundings, and thus, was not making a point to memorialize an act of vandalism, and 2) that when he realized what he was witnessing, he removed himself from the office and the Capitol building as swiftly as he was able given the crowds. Nor do any of the other circumstances cited by the government differentiate Mr. Holdridge's case from any other in an aggravated way. He did not premeditate his crime, prepare, glorify or make light of the conduct during or after, or indicate in any way that he wished to commit such a crime again. He left the Capitol building promptly after witnessing vandalism and he left the events of January 6 more generally utterly disillusioned about the rioters and their cause. No statement he has made since has indicated a willingness to participate in such conduct again. His conduct speaks for itself and demonstrates the low likelihood that he will recidivate.

Finally, a custodial sentence would not provide Mr. Holdridge with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Many January 6 defendants are business owners and professionals with strong support – substantial savings, established careers to which they can return, or successful family members, who can provide money or housing for them in the event they are incarcerated and absorb the continuing consequences of the conviction. Mr. Holdridge has no such safety net. His wife and parents are dead, and the only close relative who lives near him, his son, has young children and works at the Dollar Tree, and is therefore unable to support Mr. Holdridge.

With his extremely limited income, a significant sentence of incarceration, like the 60 days the government recommends, would seriously derail his fragile financial life, making homelessness a realistic possibility. He currently lives with roommates and pays $800 per month for a room, which is very reasonable for the area he lives in. If he is incarcerated, his social security disability benefits will cease on the 30th day and will not begin payments again until after he has been released for at least a month. "If you receive Social Security, we'll suspend your benefits if you're convicted of a criminal offense and sentenced to jail or prison for more than 30 continuous days. We can reinstate your benefits starting with the month following the month of your release." *See* Social Security Administration, Publication No. 05-10133 "What Prisoners Need To Know" (June 2021)  https://www.ssa.gov/pubs/EN-05-10133.pdf at p. 2-3 ("Example: George received monthly Social Security disability benefits before he was convicted of a crime and sent to prison on May 15, 2020. His benefits were suspended effective May 2020. On October 10, 2020, George was released from prison. His benefits were reinstated effective November 2020. Since Social Security benefits are paid in the month following the month for which they are due, George will receive his November benefit in December 2020.") Unable to pay his rent, Mr. Holdridge will lose his room, and once released, have no income to pay rent, let alone put down a deposit *and* pay first month's rent on a new room. His health is fragile and homelessness would undermine the stability he has achieved in managing his medications for congestive heart failure, high blood pressure and high cholesterol.

That lack of stability would unnecessarily undermine his ability to reintegrate into society.

B. <u>The Court Should Sentence Mr. Holdridge to Probation to Avoid Sentencing Disparities</u>

A sentence of probation is also justified in light of the sentences imposed on similarly situated Capitol riot defendants. While it is true that a large number of defendants have been sentenced for a wide variety of conduct, where all defendants were sentenced for a single violation of 40 U.S.C. § 5104(e)(2)(G), common aggravating and mitigating factors have emerged that appear to have a predictable effect on a defendant's sentence. The government argues that among section 5104(e)(2)(G) cases, the absence of violent or destructive conduct is a given, but there are several other aggravating factors common among such cases that are not present in Mr. Holdridge's case: the presence of weapons or other supplies of war, the incitement of others and inflammatory statements made to news outlets or on social media indicating either the premeditated intention to join the riots or a lack of remorse for having joined them. Moreover, the government argues that Mr. Holdridge's prior criminal history is reason enough to give him a custodial sentence, but the non-custodial sentences received by other defendants with criminal histories do not bear that out.

Mr. Holdridge made no inflammatory statements to media outlets or on social media and did not incite others. In *United States v. Jennifer Ryan,* 1:21-CR-00050-CRC, the government sought and received a 60-day custodial sentence because

Ms. Ryan live-streamed her activities on January 6, 2021, to her many followers, encouraged a violent attack, and expressed no remorse thereafter. *Ryan,* Dkt. 48. Similarly, in *United States v. Mariposa Castro*, 1:21-CR-00299-RBW, this Court sentenced Ms. Castro to 45 days in custody. In that case, Ms. Castro live-streamed her presence on Capitol grounds for 47 minutes, articulated her desire to break into the Capitol, did go in through a smashed window, and called upon her social media followers to join her in a "civil war." Dkt. 35 at 3; Dkt. 40 at 2. Later, she posted that she intended to return to the Capitol. Dkt. 40 at 16. In *United States v. Lori Vinson,* 1:21-CR-00355-RBW, Ms. Vinson made unremorseful statements to the media after the riot indicating the potential for recidivism, including "I would do it again tomorrow." Although the government sought 30 days of incarceration, this Court sentenced her to 60 months' probation.

A significant criminal history does not preclude a non-custodial sentence. The government's most repeated argument is that Mr. Holdridge's admittedly lengthy criminal history demonstrates that he is nothing more than a scofflaw that must be taught a lesson. But, as set forth above, his prior criminal convictions bear little similarity to the present conduct, and a substantial criminal history has not barred a noncustodial sentence in other cases.  In *United States v. Israel Tutrow*, 1:21-CR-00310-ABJ, the defendant, who had a "significant" criminal history, entered and remained inside the Capitol building for about 30 minutes, *while armed with a knife* and later lied to police. *Tutrow,* Dkt. 43 at 1-2. Nevertheless, the district court sentenced him to 60 days of home confinement. In *United States*

14

*v. Zlab*, the government sought a 45-day custodial sentence for Mr. Zlab, because he left the Capitol Building only because law enforcement officers made efforts to push him out and because he had a prior conviction for domestic violence. *Zlab,* Dkt. 44 at 2. This Court sentenced him to 36-months probation. Again, in *United States v. Michael Rusyn*, 1:21-CR-00303-ABJ, the defendant had two relevant recent convictions for misdemeanor assault and contempt of court. Nevertheless, despite the existence of those convictions and others, the district court sentenced Mr. Rusyn to two months of home detention.  Where, as here, the offense conduct is less aggravated than in other cases, a noncustodial sentence is appropriate, in spite of significant or relevant criminal history.

## IV.    CONCLUSION

Brent Holdridge broke the law when he entered and remained in the Capitol. His conduct is not defensible. Still, given Mr. Holdridge's history and characteristics, the relative conduct of other defendants and sentences imposed to date, and the collateral consequence of a custodial sentence on Mr. Holdridge's housing, a probationary sentence is not only defensible but warranted. For the reasons set forth above, Mr. Holdridge respectfully requests that the Court impose a sentence of 36 months of probation, $500 in restitution, and no fine.

Dated:    November 14, 2022              Respectfully submitted,

                                         JODI LINKER
                                         Federal Public Defender
                                         Northern District of California

                                                    /S
                                         _____
                                         GABRIELA BISCHOF
                                         Assistant Federal Public Defender